| |
|---|
| **CPPIB Credit Invs. II Inc. v Deutsche Bank Trust Co. Ams.** |
| 2026 NY Slip Op 31052(U) |
| March 17, 2026 |
| Supreme Court, New York County |
| Docket Number: Index No. 654398/2024 |
| Judge: Joel M. Cohen |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 03M

----------------------------------------------------------------------------------X

CPPIB CREDIT INVESTMENTS II INC., CPPIB CREDIT INVESTMENTS III INC., THEBES OFFSHORE MASTER FUND, LP,

Plaintiffs,

- v -

DEUTSCHE BANK TRUST COMPANY AMERICAS, EAGLE EQUITY PARTNERS V, LLC,AIC INVESTMENT HOLDINGS LLC - SERIES II, AMERIGROUP MARYLAND, INC.,BALDR BAYES FUND INC.,BGF GLOBAL HIGH YIELD BOND FUND, BLACKROCK CAPITAL ALLOCATION TERM TRUST, BLACKROCK CORE BOND TRUST, BLACKROCK CORPORATE HIGH YIELD FUND, INC.,BLACKROCK CREDIT ALLOCATION INCOME TRUST, BLACKROCK CREDIT STRATEGIES FUND, BLACKROCK DEBT STRATEGIES FUND, INC.,BLACKROCK DYNAMIC HIGH INCOME PORTFOLIO OF BLACKROCK FUNDS II, BLACKROCK ESG CAPITAL ALLOCATION TERM TRUST, BLACKROCK EVENT DRIVEN EQUITY FUND OF BLACKROCK LARGE CAP SERIES FUNDS, INC.,BLACKROCK GLOBAL ALLOCATION FUND, INC.,BLACKROCK GLOBAL ALLOCATION PORTFOLIO OF BLACKROCK SERIES FUND, INC.,BLACKROCK GLOBAL ALLOCATION V.I. FUND OF BLACKROCK VARIABLE SERIES FUNDS, INC.,BLACKROCK GLOBAL EVENT PARTNERS MASTER LTD, BLACKROCK GLOBAL FUNDS - DYNAMIC HIGH INCOME FUND, BLACKROCK GLOBAL FUNDS - ESG GLOBAL CONSERVATIVE INCOME FUND, BLACKROCK GLOBAL FUNDS - FIXED INCOME GLOBAL OPPORTUNITIES FUND, BLACKROCK GLOBAL FUNDS - GLOBAL MULTI-ASSET INCOME FUND, BLACKROCK GLOBAL FUNDS - SUSTAINABLE FIXED INCOME GLOBAL OPPORTUNITIES FUND, BLACKROCK GLOBAL FUNDS - US DOLLAR HIGH YIELD BOND FUND, BLACKROCK GLOBAL FUNDS - US DOLLAR SHORT DURATION BOND FUND, BLACKROCK GLOBAL FUNDS GLOBAL ALLOCATION FUND, BLACKROCK GLOBAL FUNDS SYSTEMATIC ESG MULTI ALLOCATION CREDIT FUND HIGH YIELD, BLACKROCK GLOBAL FUNDS-ESG GLOBAL MULTI-ASSET INCOME FUND, BLACKROCK GLOBAL HIGH YIELD SUSTAINABLE CREDIT SCREENED FUND, BLACKROCK GLOBAL INVESTMENT SERIES - INCOME STRATEGIES PORTFOLIO, BLACKROCK GLOBAL LONG/SHORT CREDIT FUND OF BLACKROCK FUNDS IV,

| | |
|---|---|
| **INDEX NO.** | 654398/2024 |
| **MOTION DATE** | 06/10/2025, 06/10/2025, 06/10/2025, 07/02/2025 |
| **MOTION SEQ. NO.** | 010 011 012 013 |

**DECISION + ORDER ON MOTION**

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 1 of 51

1 of 51

BLACKROCK HIGH YIELD BOND PORTFOLIO OF BLACKROCK FUNDS V, BLACKROCK HIGH YIELD PORTFOLIO OF BLACKROCK SERIES FUND II, INC.,BLACKROCK HIGH YIELD V.I. FUND OF BLACKROCK VARIABLE SERIES FUNDS II, INC.,BLACKROCK INCOME FUND OF BLACKROCK FUNDS V, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INSTITUTIONAL TRUST COMPANY, NA, BLACKROCK INVESTMENT MANAGEMENT (AUSTRALIA) LIMITED AS RESPONSIBLE ENTITY OF THE BLACKROCK GLOBAL ALLOCATION FUND (AUST), BLACKROCK LIMITED DURATION INCOME TRUST, BLACKROCK LOW DURATION BOND PORTFOLIO OF BLACKROCK FUNDS V, BLACKROCK MANAGED INCOME FUND OF BLACKROCK FUNDS II, BLACKROCK MULTI-ASSET INCOME PORTFOLIO OF BLACKROCK FUNDS II, BLACKROCK MULTI-SECTOR INCOME TRUST, BLACKROCK MULTI-STRATEGY CREDIT MASTER FUND LTD., BLACKROCK SPECIALIST STRATEGIES FUNDS - BLACKROCK MULTI-STRATEGY CREDIT FUND, BLACKROCK STRATEGIC FUNDS - BLACKROCK GLOBAL EVENT DRIVEN FUND, BLACKROCK STRATEGIC INCOME OPPORTUNITIES PORTFOLIO OF BLACKROCK FUNDS V, BLACKROCK SUSTAINABLE HIGH YIELD BOND FUND OF BLACKROCK FUNDS V, BLACKROCK SUSTAINABLE LOW DURATION BOND FUND OF BLACKROCK FUNDS V, BLACKROCK SYSTEMATIC MULTI ALLOCATION CREDIT FUND HIGH YIELD, BLACKROCK SYSTEMATIC MULTI-STRATEGY ALPHA MASTER FUND LTD., BLACKROCK SYSTEMATIC MULTI-STRATEGY FUND OF BLACKROCK FUNDS IV, BRIGHTHOUSE FUNDS TRUST I - BLACKROCK HIGH YIELD PORTFOLIO, CALIFORNIA PUBLIC EMPLOYEES RETIREMENT SYSTEM, CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, CANADA FIXED INCOME GLOBAL OPPORTUNITIES FUND, CIVIL AVIATION AUTHORITY PENSION SCHEME, EMPIRE HEALTH CHOICE ASSURANCE INC.,EMPLOYEES' RETIREMENT FUND OF THE CITY OF DALLAS, FONDITALIA - BOND GLOBAL HIGH YIELD FUND, GLOBAL ATLANTIC INVESTMENT ADVISORS LLC., IMCO GLOBAL CREDIT LP, ISHARES, ISHARES CORE 5-10 YEAR USD BOND ETF, ISHARES CORE TOTAL USD BOND MARKET ETF,

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

**page 2 of 51**

[* 2]

ISHARES ESG ADVANCED HIGH YIELD CORPORATE BOND ETF, ISHARES ESG ADVANCED TOTAL USD BOND MARKET ETF, ISHARES I BONDS 2029 TERM HIGH YIELD AND INCOME ETF, ISHARES II PUBLIC LIMITED COMPANY, ISHARES ILL PLC, ISHARES U.S. FIXED INCOME BALANCED RISK FACTOR ETF, JNL/BLACKROCK GLOBAL ALLOCATION FUND, KAPITALFORENINGEN PENSAM, LVIP BLACKROCK GLOBAL ALLOCATION FUND, METROPOLITAN LIFE INSURANCE COMPANY, ON BEHALF OF ITS SEPARATE ACCOUNT NO. 479, MORNINGSTAR ALTERNATIVES FUND A SERIES OF MORNINGSTAR FUNDS TRUST, MULTI-MANAGER HIGH YIELD OPPORTUNITY FUND, NATIONAL TELECOMMUNICATIONS COOPERATIVE ASSOCIATION, PENSIONSKASSE STADT ZURICH, PPL SERVICES CORPORATION MASTER TRUST, RENAISSANCE INVESTMENT HOLDINGS LTD., SIX CIRCLES CREDIT OPPORTUNITIES FUND, SOMERS RE LTD., STICHTING BEDRIJFSTAKPENSIOENFONDS VOOR DE DETAILHANDEL, STICHTING DELA DEPOSITARY & MANAGEMENT, SYSTEMATIC TOTAL ALPHA, THE NEW ZEALAND GUARDIAN TRUST COMPANY LIMITED AS TRUSTEE FOR AMP WHOLESALE HIGH YIELD BOND FUND, TWO DEGREE LLC,US HIGH YIELD PASSIVE PORTFOLIO, DIAMETER CREDIT FUNDING I, LTD., DIAMETER CREDIT FUNDING II, LTD., DIAMETER CREDIT FUNDING III, LTD., DIAMETER CREDIT FUNDING LV, LTD., DIAMETER DISLOCATION MASTER FUND II LP, DIAMETER MASTER FUND LP, LIBERTY 77 FUND INTERNATIONAL L.P., LIBERTY 77 FUND L.P., COMMISSIONERS OF THE LAND OFFICE, CONTRA COSTA COUNTY EMPLOYEES RETIREMENT ASSOCIATION, VIRTUS CONVERTIBLE & INCOME FUND, VIRTUS CONVERTIBLE & INCOME FUND II, VIRTUS DIVERSIFIED INCOME & CONVERTIBLE FUND, VIRTUS INCOME & GROWTH FUND, STARZ ENTERTAINMENT CORPORATION (F/K/A LIONS GATE, ENTERTAINMENT CORPORATION), STARZ CAPITAL HOLDINGS LLC (F/K/A LIONS GATE CAPITAL HOLDINGS LLC),

Defendants.

-----------------------------------------------------------------------------------X

HON. JOEL M. COHEN:

The following e-filed documents, listed by NYSCEF document number (Motion 010) 179, 180, 181, 182, 206

were read on this motion to _____ DISMISS _____.

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 3 of 51

3 of 51

The following e-filed documents, listed by NYSCEF document number (Motion 011) 194, 195, 210 were read on this motion to _____ DISMISS _____ .

The following e-filed documents, listed by NYSCEF document number (Motion 012) 191, 192, 193, 207, 208 were read on this motion to _____ DISMISS _____ .

The following e-filed documents, listed by NYSCEF document number (Motion 013) 184, 185, 186, 196, 197, 198, 199, 205, 209, 221, 222, 223 were read on this motion to _____ DISMISS _____ .

This action involves a variant of an "up-tiering" or "liability management" transaction. In its broadest terms, such transactions involve arrangements in which a borrower cuts a favorable deal with a majority of its joint lenders/noteholders to the purported economic detriment of the minority, typically via a contractual amendment to which only the majority consented. Not surprisingly, this has sometimes led to litigation. In some cases, the minority creditors sufficiently alleged that the transaction ran afoul of contractual "sacred rights" provisions—which cannot be amended without their consent—and their claims survived dispositive motions (*e.g.*, *In re Serta Simmons Bedding, L.L.C.*, 125 F4th 555 [5th Cir 2024] ["*Serta*"]; *Axos Fin., Inc. v Reception Purchaser, LLC*, 88 Misc 3d 1203(A) [Sup Ct, NY County 2026] ["*STG*"]; *Audax Credit Opportunities Offshore Ltd. v TMK Hawk Parent, Corp.*, 72 Misc 3d 1218(A) [Sup Ct, NY County 2021] ["*TriMark*"]). In others, they did not and their claims were dismissed (*e.g.*, *Ocean Trails CLO VII v MLN Topco Ltd.*, 233 AD3d 614 [1st Dept 2024] ["*Mitel*"]). This one, as described below, is a bit of both.

In this case, according to Plaintiffs, the borrower (Legacy Lions Gate) sought for commercial reasons to separate its business into two parts: (i) its successful "Studio Business;" and (ii) a recently acquired but struggling "Starz Business." An obstacle to doing so was Legacy Lions Gate's obligations under a $1 billion Indenture agreement that were guaranteed by *both*

654398/2024 CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL page 4 of 51
Motion No. 010 011 012 013

4 of 51

businesses.  To eliminate the problem, Legacy Lions Gate persuaded a majority of noteholders to consent to various Indenture amendments that, among other things, permitted the Studio Business guarantors to be released.  In return, Legacy Lions Gate permitted these "Participating Noteholders" to exchange their old notes for longer term, higher interest rate notes that were guaranteed by the Studio Business that was cleaved from the Indenture.  That left the non-consenting minority noteholders (including Plaintiffs) with their existing notes—and the "gutted" Indenture—now backed only by the purportedly struggling Starz Business.  The market value of the Indenture notes declined significantly.  Plaintiffs allege that this transaction breached, among other things, various "sacred rights" provisions in the Indenture that could not be modified without their consent.  This litigation ensued.

Defendants Starz Entertainment Corp. (f/k/a Lions Gate Entertainment Corp.) and Starz Capital Holdings LLC (f/k/a Lions Gate Capital Holdings LLC) (together, "Legacy Lions Gate"), Participating Noteholders,[1] Deutsche Bank Trust Company Americas, as indenture trustee ("Deutsche Bank" or "Trustee"), and Eagle Equity Partners V, LLC ("Eagle Equity") (collectively, the "Movants") now move to dismiss the separate but similar complaints filed by Plaintiffs CPPIB Credit Investments II Inc., CPPIB Credit Investments III Inc. (together, "CPPIB") and Plaintiff-Intervenor Thebes Offshore Master Fund, LP ("Thebes").

As discussed below, the Court finds the following:

*First*, the Indenture's "no-action" provision does not preclude Plaintiffs from challenging Indenture amendments that (taking the allegations as true) required Plaintiffs' individual consent. Nor does it preclude Thebes' separate breach of contract claim against Indenture Trustee

---

[1] The "Participating Noteholders" are defined in Appendix 1 to the Participating Noteholders' Notice of Motion to Dismiss (NYSCEF 194).

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

page 5 of 51

5 of 51

Deutsche Bank. The no-action provision does, however, bar Thebes from pursuing breach of contract claims against Legacy Lions Gate that do not implicate Thebes' individual consent rights.

*Second*, Plaintiffs have stated a viable—though as yet unproven—claim for a declaratory judgment that Legacy Lions Gate breached Section 9.02(e)(8) of the Indenture by adopting amendments that "modify the form of the Notes Guarantee in [a] manner adverse to the Holders" and "release[d] the Guarantors constituting all or substantially all of the value of the Notes Guarantees of all Guarantors as a whole" without obtaining the consent of "each affected Holder" (including Plaintiffs). Their declaratory judgment claims asserting breach of three other "sacred rights" provisions, as well as their claims for breach of the implied covenant of good faith and fair dealing, are dismissed.

*Third*, Trustee Deutsche Bank's motion to dismiss Thebes' breach of contract claim is granted. Thebes has failed to allege an event of default of which the Trustee had the contractually required notice. The implied covenant claim against the Trustee is also dismissed.

*Fourth*, Thebes' breach of contract claims against the Participating Noteholders are dismissed because the defendant noteholders are not parties to the Indenture (without prejudice to seeking leave to amend to assert non-contractual claims). The claims against certain of the Participating Noteholders are dismissed on the additional and independent grounds of lack of personal jurisdiction and sovereign immunity against being sued in New York.

*Fifth*, Eagle Equity's motion to dismiss Thebes' tortious interference claim is denied. Thebes has adequately alleged its claim, which is not defeated conclusively (at the motion to dismiss stage) by Eagle Equity's proffered "economic interest" defense.

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

page 6 of 51

6 of 51

[* 6]

## FACTUAL ALLEGATIONS

CPPIB (the original plaintiffs) and Thebes (a plaintiff-intervenor) filed and later amended separate complaints that tell essentially the same story (NYSCEF 170 [CPPIB's First Amended Complaint ("CPPIB Compl.")]; NYSCEF 178 [Thebes' Third Amended Complaint ("Thebes Compl.")]).  The pertinent factual allegations of the most recent versions of those complaints, which are assumed to be true for purposes of the pending motions to dismiss, are summarized below.  The principal difference between the complaints is that while CPPIB seeks targeted contractual relief under the Indenture solely against Legacy Lions Gate, Thebes adds separate claims against the Participating Noteholders, the Indenture Trustee, and a third party (Eagle Equity) that purportedly "interfered" with the parties' contractual relationship by "masterminding" the "scheme" alleged in its complaint.[2]

\* \* \* \*

### The Starz Acquisition (2016)

In 2016, five years before the Indenture, Lions Gate had been "riding high, generating billions in revenues from its Studios Business [*Hunger Games*, *Twilight*, etc.] and basking in the glow of its soaring stock price" (CPPIB Compl. ¶ 3; *see also* Thebes Compl. ¶ 50).  Nevertheless, "[i]n an attempt to increase its revenues, Legacy Lions Gate decided in 2016 to spend $4.4 billion to purchase the Starz business, a former cable network turned digital subscription platform" (CPPIB Compl. ¶ 3).  It was, according to Plaintiffs, an unsuccessful

---

[2] Plaintiffs' maintenance of parallel partially overlapping complaints has complicated the Court's disposition of these voluminous motions.  With some of the claims having been winnowed down via this decision and order, the Court directs Plaintiffs to meet and confer on preparing a consolidated amended complaint.

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

**page 7 of 51**

7 of 51

investment. By 2022, "Legacy Lions Gate's stock price had fallen to new record lows. Legacy Lions Gate pinned at least part of the blame for this deterioration on the Starz Business" (*id*.).

### The Indenture (2021)

In the midst of that purported downturn in its fortunes, in April 2021, Legacy Lions Gate issued approximately $1 billion in 5.500% Senior Notes Due in April 2029 (the "Notes") (CPPIB Compl. ¶ 25; Thebes Compl. ¶¶ 56–58). The obligations of Legacy Lions Gate as lender and Deutsche Bank as trustee, as well as the rights and protections of noteholders, were set forth in an Indenture agreement (NYSCEF 74 [the "Indenture"]). The signatories to the Indenture are Legacy Lions Gate (including guarantors) and Deutsche Bank as trustee. CPPIB and Thebes are Holders of Notes issued under the Indenture.

The Indenture provided Noteholders with contractual protections upon which Plaintiffs relied when purchasing the Notes (CPPIB Compl. ¶ 27; Thebes Compl. ¶ 61). As relevant here, the Indenture permitted Lions Gate and the Trustee to modify most of its provisions with the consent of the holders of a majority of the principal amount of the Notes, but identified certain key contractual rights—"sacred rights"—that could be modified only with the consent of "each affected Noteholder" (Indenture §§ 9.02[a], [e]).

Specifically, Section 9.02(a) of the Indenture states that:

*Except as provided below in this Section 9.02*, the Issuer and the Trustee may amend or supplement this Indenture, the Notes or the Notes Guarantees with the consent of the Holders of a majority in principal amount of the Notes (including Additional Notes, if any) then outstanding voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes)[.]

(Indenture § 9.02[a] [emphasis added]).

Section 9.02(e) of the Indenture then sets forth a list of the "sacred rights" exceptions to Section 9.02(a). It provides, as relevant to the claims in this case, that:

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT
CORPORATION, ET AL
Motion No.  010 011 012 013

page 8 of 51

8 of 51

(e) ***Without the consent of each affected Holder***, an amendment, supplement or waiver under this Section 9.02 ***may not***: . . .

(3) reduce the principal of or extend the Stated Maturity of any Note;

(4) reduce the premium payable upon the redemption or repurchase of any Note or change the time at which any Note may be redeemed or repurchased as described under Section 3.07 whether through an amendment or waiver of provisions in the covenants, definitions or otherwise; . . .

(6) amend the right of any Holder to institute suit for the enforcement of any payment of principal, premium, if any, or interest on or with respect to such Holder's Notes on or after the respective due dates expressed in this Indenture or such Notes; . . .

(8) modify the form of the Notes Guarantee in any manner adverse to the Holders or release the Guarantors constituting all or substantially all of the value of the Notes Guarantees of all Guarantors as a whole . . .

(*id.* §§ 9.02[e][3], [4], [6], [8] [emphasis added]).

Section 10.06 (a) ("Release of Notes Guarantees") of the Indenture set forth five circumstances in which a guarantor may be released from its obligations under the Notes Guarantee:

A Guarantor (other than, with respect to clauses (1), (2), (3) and (5) below, LGEC) shall be automatically and unconditionally released and discharged from its obligations under its Notes Guarantee and this Indenture, and no further action by such Guarantor, the Issuer or the Trustee shall be required for the release of such Guarantor's Notes Guarantee, upon:

(1) . . . any sale, assignment, transfer, conveyance, exchange or other disposition of all or substantially all the assets of such Guarantor . . . [where] such … disposition is made in compliance with this Indenture, including, … Article 5;

(2) the release or discharge of such Guarantor from its Guarantee of Indebtedness under the Senior Credit Facility (including by reason of the termination of the Senior Credit Facility) and all other Material Indebtedness of the Issuer and the Guarantors;

(3) the proper designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary;

654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT          page 9 of 51
CORPORATION, ET AL
Motion No.  010 011 012 013

9 of 51

(4) the Issuer exercising its Legal Defeasance option in accordance with Article 8 or the Issuer's obligations under this Indenture being discharged in accordance with the terms of this Indenture; or

(5) in the case of any Guarantor which has provided a Notes Guarantee in the Issuer's discretion and which does not or, substantially contemporaneously with the release, will not Guarantee any Material Indebtedness of the Issuer, the Issuer's delivering notice to the Trustee of its election to release such Guarantor from its Notes Guarantee; and . . . .

(*id.* § 10.06[a]).

### The Separation Transaction

"In an effort to make amends with shareholders upset with the Starz strategic blunder, Legacy Lions Gate resolved to separate its highly valuable television and movie studio business segments, along with its film and television libraries, from the languishing Starz segment" (Thebes Compl. ¶ 5). "As early as November 2021 [seven months after the Indenture], Legacy Lions Gate told investors that it was considering a capital markets transaction to separate the Starz business from the Studio Business" (Thebes Compl. ¶ 9).

On December 22, 2023, Legacy Lions Gate announced that it had entered into a Business Combination Agreement with Screaming Eagle Acquisition Corp. ("SEAC")—sponsored by defendant Eagle Equity—a publicly-traded special purpose acquisition company (CPPIB Compl. ¶ 44; Thebes Compl. ¶¶ 10, 11, 32). Among other things, the Business Combination Agreement provided that certain institutional and accredited investors had agreed to purchase $175 million worth of shares in LG Studios in a private investment in public equity ("PIPE") investment (Thebes Compl. ¶ 88). For its part, Legacy Lions Gate announced that it would, through a series of transactions, transfer the Studios Business to a SEAC-affiliated entity in order to create a new

**654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

**page 10 of 51**

10 of 51

[* 10]

publicly-traded company called Lions Gate Studios, leaving Legacy Lions Gate with only the Starz Business (the "Separation Transaction") (CPPIB Compl. ¶ 47).

According to Thebes, the purported "mastermind" of this "scheme" to separate the Legacy Lions Gate businesses to the detriment of noteholders was Harry Sloan, "a Legacy Lions Gate director who, through his investment firm Eagle Equity, induced Lions Gate Entertainment's subsidiary LG Holdings to breach its contractual obligations so that Legacy Lions Gate could transfer its valuable studio assets to the SPAC in which Eagle Equity was heavily invested. While Legacy Lions Gate's breach did wonders for Eagle Equity's financial interests in the SPAC, it came at the expense of Thebes and other similarly-situated holders of Notes issued in April 2021, who, due to this business separation, are left holding the bag in an entity with a negative implied equity value" (Thebes Compl. ¶ 6).

As further detailed below, the purported "scheme" consisted of a multi-step integrated transaction.

### *The Formation of LG Studios*

First, as noted, Legacy Lions Gate transferred its Studio Business to SEAC (Thebes Compl. ¶¶ 83, 85). Legacy Lions Gate's non-Starz businesses were "spun off into an indirect, wholly-owned subsidiary (constituting an 'Affiliate' under the Indenture), which in turn transferred the Studio Business to a SEAC-affiliated entity in order to create a new publicly traded company called LG Studios. The new LG Studios was valued at $4.6 billion and held substantially all of the assets formerly belonging to Lions Gate Entertainment other than Starz" (Thebes Compl. ¶ 91). As a result of the SEAC Transaction, "Eagle Equity, other SEAC investors, and the PIPE investors collectively owned 12.7% of the equity in LG Studios. In return

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

page 11 of 51

11 of 51

for its equity stake in LG Studios, SEAC agreed to inject at least $350 million in cash into LG Studios" (Thebes Compl. ¶ 92).

Initially, the remaining 87.3% of the equity in Lions Gate Studios continued to be owned by Legacy Lions Gate through Lions Gate Entertainment (now called Starz Entertainment), which also continued to hold 100% of the Starz Business (CPPIB Compl. ¶ 49; Thebes Compl. ¶ 93).

Although the Business Combination Agreement was entered in December 2023, the SEAC Transaction was scheduled to close in May 2024, a date that was designed to give Legacy Lions Gate and Eagle Equity time to make necessary amendments to the Indenture to facilitate the transaction (Thebes Compl. ¶ 95). According to Thebes, without such amendments, the consummation of just the SEAC Transaction alone would have violated the Indenture covenants against "Asset Sales," "Change of Control" transactions, and "Affiliate Transactions" which, in turn, "would have foreclosed the SEAC Transaction or required Legacy Lions Gate to buy out all of the Notes at a premium" (Thebes Compl. ¶ 96). Thebes alleges that "the Change of Control and other provisions of the [] Indenture presented a serious impediment to the closing of the SEAC Transaction" because "Legacy Lions Gate could not afford to offer 101% to repurchase all of the Notes" (Thebes Compl. ¶ 102).

### *The Alleged "Redemption"*

Second, Legacy Lions Gate obtained the support of the Participating Noteholders to amend the Indenture through a purported "redemption" of their old Notes via an exchange offer for new Notes on more favorable terms[3] (CPPIB Compl. ¶¶ 6–7). Thebes alleges that the

---

[3] Legacy Lions Gate disputes that this transaction—structured as an exchange offer—was in fact a "redemption" of the Participating Noteholders' original notes.

654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT        page 12 of 51
CORPORATION, ET AL
Motion No. 010 011 012 013

12 of 51

Participating Noteholders initially opposed the proposed Separation Transaction and threatened to sue to challenge the business separation, but Legacy Lions Gate and Eagle Equity reached a "secret bargain" with them to avoid litigation (Thebes Compl. ¶¶ 16, 22, 103). To appease those noteholders and to remove potential obstacles to the purported scheme, Legacy Lions Gate and Eagle Equity's "solution was to conspire with" these Participating Noteholders "to provide them non-*pro rata* benefits at the [Plaintiffs'] expense, in exchange for their agreement to change the terms of the [] Indenture purportedly to permit the Scheme" (Thebes Compl. ¶ 103).

As noted above, the changes sought by Legacy Lions Gate required the consent of (at least) the Holders of a majority of the principal value of the Notes (CPPIB Compl. ¶ 7). "The favored noteholders were only too happy to help facilitate these amendments in exchange for the more favorable terms they had negotiated into the New Notes, which would be backed entirely by the lucrative Studios Business" (CPPIB Compl. ¶ 7).

The purported "redemption" consisted of interlocking steps that occurred on the same day: first, Legacy Lions Gate, the Participating Noteholders, and the Trustee "purported to amend the [] Indenture, gutting almost every important protection and guarantee upon which noteholders relied when purchasing the Notes; and second, Legacy Lions Gate and [the Trustee] redeemed the [Participating] Noteholders' Notes in exchange for New Notes issued by Legacy Lions Gate to the [Participating] Noteholders at par, allowing those noteholders to exit the savaged [] Indenture and evade the consequences of their purported amendments." (Thebes Compl. ¶ 108). The terms of the "redemption" were memorialized in an "Exchange Agreement" executed by Legacy Lions Gate and the Participating Noteholders on or about May 2, 2024 (the "Exchange Agreement") (CPPIB Compl. ¶ 58; NYSCEF 76).

**654398/2024 CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No. 010 011 012 013**

page 13 of 51

13 of 51

[* 13]

According to Thebes, "the purported amendment and the Notes redemption and exchange were parts of the same transaction, stating that the [Participating] Noteholders had agreed to certain amendments to the [] Indenture 'as a material inducement to [Legacy Lions Gate's] participation in the [Redemption].'" (Thebes Compl. ¶108). Shortly after the "redemption," the legacy Notes' market price dropped from 77 cents to 61 cents on the dollar—a decline of approximately 20% (Thebes Compl. ¶¶ 25, 126).

### *The Supplemental Indenture*

The amendments were memorialized in Supplemental Indenture No. 10, dated May 8, 2024 (NYSCEF 66 ["Supplemental Indenture"]). The Supplemental Indenture made a number of changes to the terms of the Indenture, including, among other things: (1) removing thirteen covenants from the Indenture; (2) removing several "events of default"; (3) adding several new provisions enabling Legacy Lions Gate to separate the Starz Business from the Studios Business; and (4) providing for the "automatic and unconditional" release of the Guarantors comprising the Studios Business upon consummation of the Separation Transaction (CPPIB Compl. ¶¶ 67–75).

Specifically, the Supplemental Indenture deleted thirteen covenants from the Indenture that, according to Plaintiffs, were designed to protect the noteholders, and which played a major role in their decision to purchase the Notes. It also released "the Issuer, the Restricted Subsidiaries and the Guarantors . . . from their respective obligations under" the following covenants:

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No. 010 011 012 013

page 14 of 51

14 of 51

| Section | Indenture | Amendment |
|---------|-----------|-----------|
| 4.03 | Titled "Reports and Other Information," which required Lions Gate Entertainment to satisfy disclosure obligations under Sections 13 and 15(d) of the Exchange Act. | DELETED |
| 4.04 | Titled "Compliance Certificate," which required LG Holdings to disclose any known Defaults to the Trustee. | DELETED |
| 4.07 | Titled "Limitations on Restricted Payments," which prohibited Lions Gate Entertainment and certain subsidiaries from making certain types of payment, such as dividends and cash payments to redeem Capital Stock. | DELETED |
| 4.08 | Titled "Limitation on Restrictions on Distribution from Restricted Subsidiaries," which prohibited Lions Gate Entertainment from allowing restrictions on certain subsidiaries' ability to pay dividends or make other contributions on its Capital Stock, or make loans to Lions Gate Entertainment or certain subsidiaries. | DELETED |
| 4.09 | Titled "Limitation on Indebtedness," which, among other things, prevented Lions Gate Entertainment and certain subsidiaries from incurring certain secured debt to the detriment of noteholders | DELETED |
| 4.10 | Titled "Sale of Assets," which, among other things, prevented Lions Gate Entertainment from selling its assets for less than Fair Market Value. | DELETED |
| 4.11 | Titled "Limitation on Affiliate Transactions," which, among other things, prevented Lions Gate Entertainment from entering into transactions with its affiliates worth more than $30 million unless certain guarantees were provided (e.g., terms as favorable as in an arms-length transaction). | DELETED |
| 4.12 | Titled "Limitations on Liens," which limited the ability of Lions Gate Entertainment and certain subsidiaries to incur liens on their property. | DELETED |
| 4.13 | Titled "Corporate Existence," which required Issuer to take steps to preserve and keep in full force and effect its corporate existence. | DELETED |
| 4.14 | Titled "Offer to Repurchase Upon Change of Control," which ensured that Thebes and other noteholders would be paid in full in the event of a change of control of Lions Gate Entertainment. | DELETED |
| 4.15 | Titled "Future Guarantees," which ensured that Lions Gate Entertainment and LG Holdings would cause certain Legacy Lions Gate-related entities to become a Guarantor under the Indenture. | DELETED |
| 4.16 | Titled "Effectiveness of Covenants," which provided for the reinstatement of certain suspended covenants in the event the | DELETED |

654398/2024 CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No. 010 011 012 013

page 15 of 51

15 of 51

[* 15]

| | | |
|---|---|---|
| | Notes' credit rating is downgraded from an Investment Grade Rating | |
| 4.17 | Titled "Limitation of Lines of Business," which required Lions Gate Entertainment to ensure certain subsidiaries would not engage in anything other than Legacy Lions Gate's primary business. | DELETED |

(Thebes Compl. ¶ 110; CPPIB Compl. ¶ 68).

The Supplemental Indenture also struck three Events of Default from the remedies provided under the Indenture:

| Section | Indenture | Amendment |
|---|---|---|
| 6.01(a)(4) | Providing as an "Event of Default" a failure by LG Holdings, any Guarantor, or certain subsidiaries to pay any Indebtedness. | DELETED |
| 6.01(a)(7) | Providing as an "Event of Default" the failure of Lions Gate Entertainment, LG Holdings, any Significant Subsidiary, or Restricted Subsidiaries to pay final judgments in excess of $75 million. | DELETED |
| 6.01(a)(8) | Providing as an "Event of Default" any Notes Guarantee or a Significant Subsidiary ceasing to be in full force and effect, or any Guarantor denying or disaffirming its obligations under the Indenture. | DELETED |

(Thebes Compl. ¶ 111; CPPIB Compl. ¶ 69).

The Supplemental Indenture also added several new provisions to the Indenture that, according to Plaintiffs, enabled Legacy Lions Gate to strip out and transfer substantially all the value of its business into LG Studios, and to fundamentally change the nature of the credit that the noteholders signed up for when they purchased their Notes (Thebes Compl. ¶ 112; CPPIB Compl. ¶ 70).

First, it replaced the original Indenture Section 5.01 ("Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets") with a new amended and restated

654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 16 of 51

16 of 51

Section 5.01 entitled "Transactions Permitted." The new Section 5.01 authorizes any "transactions that result in the separation of the Studio Business and the STARZ Business," as determined by Lions Gate Entertainment in its sole and absolute discretion "and any related transactions entered into in connection therewith" (Supplemental Indenture §§ 2(a)(v), 2(d); Thebes Compl. ¶ 113; CPPIB Compl. ¶ 71).

Second, Section 2(c) of the Supplemental Indenture adds a new Section 3.09 to the Indenture providing that: "For the avoidance of doubt, the Supplemental Indenture Transactions [including the Exchange Transaction, the Separation Transaction, and other transactions relating thereto] are not being effected pursuant this Article 3 and this Article 3 does not and will not apply to the Supplemental Indenture Transactions." According to Plaintiffs, this amendment purports to create a safe harbor exception to the Indenture's requirement in Section 3.02 that all optional or partial redemptions must be deemed "fair and appropriate" by the Trustee pursuant to Section 3.07. (Thebes Compl. ¶ 114; CPPIB Compl. ¶ 72).

Third, the Supplemental Indenture waives Events of Default relating to or arising from the amendments in the Supplemental Indenture, or any of the transactions contemplated thereby (Supplemental Indenture § 4; Thebes Compl. ¶ 115; CPPIB Compl. ¶ 73).

Fourth, the Supplemental Indenture amends the definition of "Material Indebtedness" to add that "notwithstanding the foregoing the [New] Notes shall not constitute Material Indebtedness." (Supplemental Indenture § 2(a)(xi); Thebes Compl. ¶ 116).

Fifth, the Supplemental Indenture amends the definition of "Unrestricted Subsidiary" to add a clause (b), which provides that "[n]otwithstanding clause (a) hereof, from and after May 8, 2024, [Lions Gate Entertainment] may at any time and from time to time designate any

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 17 of 51

17 of 51

Subsidiary to be an Unrestricted Subsidiary. . . " (Supplemental Indenture § 2(a)(xii); Thebes Compl. ¶ 117).

Sixth, and perhaps most heavily relied upon by Plaintiffs, Section 2.7(f) of the Supplemental Indenture added a new trigger for the automatic and unconditional release of Notes Guarantee in addition to the five triggers previously included under Section 10.06(a). Specifically, new Section 10.06(a)(6) provides that, upon the consummation of the Separation Transaction, "any Guarantor that is part of the Studio Business (as determined by LGEC in its sole discretion)" will be automatically released from all of its obligations under the Notes (Supplemental Indenture § 2.7(f); Thebes Compl. ¶ 118; CPPIB Compl. ¶ 74).

### *Completion of the Separation Transaction*

On May 5, 2025, Legacy Lions Gate designated 68 Guarantor entities as "Unrestricted Subsidiaries" pursuant to the definition of "Unrestricted Subsidiary" contained in the Indenture (*id.* ¶ 77; Thebes Compl. ¶¶ 135, 145; NYSCEF 174 [May 5, 2025 Officers' Certification of Lionsgate Entertainment Corp.]). Plaintiffs allege that this maneuver explicitly relied on amendments to the Indenture through the Supplemental Indenture and "was an integral step in Legacy Lions Gate stripping all or substantially all of the value of [Plaintiffs'] Notes Guarantees through the consummation of the Separation Transaction" (CPPIB Compl. ¶ 77).

Finally, on May 6, 2025, Legacy Lions Gate completed the Separation Transaction. Through a series of transactions, Lions Gate Entertainment shed its 87.3 percent interest in Lions Gate Studios, renaming itself Starz Entertainment, and cleaved itself into two publicly-traded companies: (i) Lions Gate Studios, holding "the lucrative Studios Business" and serving as "the credit support for the New Notes"; and (ii) Starz Entertainment, which is the renamed former

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No. 010 011 012 013

page 18 of 51

18 of 51

Lions Gate Entertainment entity now divested of all but the Starz Business, and which is now the sole credit support for Plaintiffs' Notes (CPPIB Compl. ¶¶ 76, 78; Thebes Compl. ¶ 27, 119).

That same day, the newly-renamed Starz Entertainment and Starz Holdings entities provided notice to the Trustee under the Indenture that 230 (of 243) Legacy Lions Gate entities affiliated with the Studios Business (the "230 Guarantors"), allegedly constituting "all or substantially all of the value of the Notes Guarantees," were "automatically and unconditionally released and discharged from any obligations under [the] Notes Guarantee and the Indenture." (CPPIB Compl. ¶¶ 79, 83). Thus, after the Separation Transaction, all that remained as credit support for CPPIB Investments Note Guarantees "were a mere thirteen Starz Business entities" (CPPIB Compl. ¶ 83).

The Officers' Certificate and the Trustee notices purporting to designate the 68 Unrestricted Subsidiaries or release the 230 Guarantors did not specify precisely which provisions of the Indenture gave rise to the release of any of the guarantor entities (NYSCEF 174, 175, 176). The trustee notices did provide that to the extent any of the entities "has not been automatically and unconditionally released and discharged from any obligations under its Notes Guarantee and the Indenture pursuant to another provision of Section 10.06(a), such entity has been automatically and unconditionally released and discharged from any obligations under its Notes Guarantee and the Indenture pursuant to Section 10.06(a)(6)," a provision added by the Supplemental Indenture (NYSCEF 175, 176).

According to Plaintiffs, Legacy Lions Gate did not provide any evidence in its Notices to the trustee to substantiate its position—asserted in this litigation—that it complied with the terms of the Indenture *without* relying on numerous provisions of the Indenture that were amended or modified by the Supplemental Indenture (CPPIB Compl. ¶¶ 79, 80). In short, Plaintiffs allege

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT
CORPORATION, ET AL
Motion No.  010 011 012 013

page 19 of 51

19 of 51

that without the amendments contained in the Supplemental Indenture, "Legacy Lions Gate could not have accomplished the Separation Transaction" (*id.* ¶ 81).

Thebes additionally alleges that the alleged scheme enriched the Participating Noteholders who, despite not providing any additional financing to Legacy Lions Gate, will continue to enjoy the backing of the valuable Studio Business and a higher interest rate on the New Notes (Thebes Compl. ¶¶ 120, 129, 133, 137). The New Notes Indenture, in addition, provided the Participating Noteholders with the same contractual protections that they agreed to strip from the Plaintiffs in the Supplemental Indenture (Thebes Compl. ¶¶ 21, 123, 129).

Thebes also alleges that "Eagle Equity—which had no economic interest in debtor Legacy Lions Gate—tortiously interfered with the Indenture by procuring breaches of the Indenture in order to reap its own financial gain as sponsor and shareholder of SEAC" (*id.* ¶ 32). According to Thebes, while not a party to the Indenture, "Eagle Equity knew of the [] Indenture's contractual limitations on the Scheme by virtue of its managing member Sloan's role as a Lions Gate Entertainment director. Nevertheless, Eagle Equity induced Legacy Lions Gate, the [Participating] Noteholders, and [the Trustee] to effectuate the Redemption to ensure that the SEAC Transaction and ultimate business separation were completed, which resulted in Eagle Equity owning a substantial share of LG Studios' thriving Studio Business without the burden of Starz or Legacy Lions Gate's debt obligations" (*id.*).

### *Procedural History*

CPPIB commenced this action on August 27, 2024 (NYSCEF 1). The Court granted Thebes' motion to intervene on October 25, 2024 (*see* NYSCEF 10, 12, 22). Thebes thereafter filed its own Amended Complaint (NYSCEF 28). Following Legacy Lions Gate's disclosure of the identities of most Participating Noteholders, Thebes filed a Second Amended Complaint on

654398/2024 CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT page 20 of 51
CORPORATION, ET AL
Motion No. 010 011 012 013

20 of 51

December 13, 2024 that asserted claims against the Participating Noteholders, without changing the substance of its underlying factual allegations (NYSCEF 47).

After Defendants' initial round of motions to dismiss were fully briefed, the business separation transaction closed in May 2025. Pursuant to a stipulation so-ordered by the Court on May 19, 2025 (NYSCEF 165), Plaintiffs filed amended complaints on May 23, 2025.

CPPIB's Amended Complaint asserts claims against Legacy Lions Gate for (i) declaratory judgment based on breach of contract and (ii) breach of the implied covenant of good faith and fair dealing (NYSCEF 170). Thebes' Third Amended Complaint asserts claims for (i) declaratory judgment against Legacy Lions Gate, the Trustee, and the Participating Noteholders, (ii) breach of contract against Legacy Lions Gate, the Trustee, and the Participating Noteholders, (iii) breach of the implied covenant against Legacy Lions Gate, the Trustee, and the Participating Noteholders, and (iv) tortious interference with contract against Eagle Equity (NYSCEF 178).

Defendants filed revised motions to dismiss Plaintiffs' operative complaints (*see* NYSCEF 180, 184, 192, 195).

## DISCUSSION

On a motion to dismiss pursuant to CPLR 3211(a)(7) for failure to state a viable claim, the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87 [1994]). A motion to dismiss pursuant to CPLR 3211(a)(1) should be "granted only where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (*Goshen v Mut. Life Ins. Co. of New York*, 98 NY2d 314, 326 [2002]).

**654398/2024 CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL** **page 21 of 51**
**Motion No. 010 011 012 013**

21 of 51

## I.    No Action Clause

As an initial matter, Legacy Lions Gate, the Participating Noteholders, and the Trustee contend that the Plaintiffs' claims must be dismissed for failure to comply with the "no-action clause" of the Indenture, a provision that was not amended in the challenged transaction (Indenture § 6.06).

Specifically, this provision (entitled "Limitation on Suits") states that: "Subject to Section 6.07 [relating to enforcement of certain payment obligations], no Holder may pursue any remedy with respect to this Indenture or the Notes unless:  (a) such Holder has previously given the Trustee notice that an Event of Default is continuing; (b) the Holders of at least 25% in principal amount of the then outstanding Notes have requested the Trustee to pursue the remedy; (c) such Holders have offered the Trustee security or indemnity reasonably satisfactory to the Trustee against any loss, liability or expense; (d) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity; and (e) the Holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction that, in the opinion of the Trustee, is inconsistent with such request within such 60-day period" (*id*.).  The provision goes on to state that "[a] Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder" (*id*.).

It is undisputed that Plaintiffs did not satisfy certain of the conditions of Section 6.06, including the requirement that holders of at least 25 percent of the principal amount have requested the Trustee to bring the instant claims on behalf of noteholders.  Accordingly, the no-action clause would support dismissal of Plaintiffs' claims unless such claims are found to be outside the scope of the clause or the clause is found to be unenforceable as applied to claims in this case.

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT**
**CORPORATION, ET AL**
**Motion No.  010 011 012 013**

**page 22 of 51**

22 of 51

[* 22]

The Court of Appeals has held that no-action clauses must be construed strictly and read narrowly (*Quadrant Structured Products Co., Ltd. v Vertin*, 23 NY3d 549, 560 [2014]). The "primary purpose" of such provisions "is to protect issuers from the expense involved in defending [individual] lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors" (*id.* at 565). "These limitations protect[ ] against the risk of strike suits" and "make[ ] it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders" (*id.* at 565–66; *see also Ellington Credit Fund, Ltd. v Select Portfolio Servicing, Inc.*, 837 F Supp 2d 162, 184 [SDNY 2011] ["[t]he purpose of no-action clauses is to protect the securitizations—and in turn other certificateholders—from the expense of litigating an action brought by a small group of certificateholders that most investors would consider not to be in their collective economic interest"]). Within those parameters, no-action clauses typically are "not unenforceable as violative of public policy, given [their] salutary purpose of preventing undue expense to certificate holders and inconvenience to the investment vehicle in general," and are not "unconscionable" (*Anato Opportunity Fund I, LP v Wells Fargo Bank, N.A.*, 153 AD3d 1161, 1162 [1st Dept 2017]).

There is an obvious tension, however, when (as here) a no-action provision is deployed to block noteholders from enforcing their *individual* consent rights provided elsewhere in the indenture (*Cypress Assoc., LLC v Sunnyside Cogeneration Assoc. Project*, 2006 WL 668441 [Del Ch 2006] [Strine, VC]). In *Cypress*, a plaintiff bondholder sued to challenge the borrower's amendment of an agreement that purportedly required, under the trust indenture, the prior written consent of holders of 80 percent of the principal amount of the outstanding bonds (which the plaintiff held sufficient interests to veto on its own). Vice Chancellor (later Chief Justice) Strine rejected the borrower's argument that the claim should be dismissed for failure to comply with

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT
CORPORATION, ET AL
Motion No.  010 011 012 013

page 23 of 51

23 of 51

the indenture's no-action provision, which prohibited claims by bondholders unless holders of at least 51 percent of principal amount of the outstanding bonds requested the Trustee to pursue a claim but it declined to do so. The court recognized the contractual tension of having a 20 percent bondholder veto right effectively blocked by requiring approval by a 51 percent majority to challenge the transaction: "By its plain terms, § 9.4 – when it applies – invests a minority of 20% or greater with the power to block an amendment favored by a majority of the Bondholders. A provision like [the no-action provision] that is designed to limit suits on behalf of all holders unless a majority supports the suit arguably does not speak at all to claims under provisions like § 9.4 which are brought only for the benefit of the dissenting minority" (*id*. at \*6). The court went on to conclude that "[i]t would be a futile exercise for [plaintiff] to ask the majority of the Bondholders who disagree with it to join with it in a suit to declare an Amendment they support invalid. Thus, [the no-action clause] does not bar this suit" (*id*. at \*7).

This Court (Kornreich, J.) cited *Cypress* with approval in *Eaton Vance Mgt. v Wilmington Sav. Fund Soc., FSB* (2018 NY Slip Op 30727[U] [Sup Ct, NY County 2018], *affd sub nom*. *Eaton Vance Mgt. v Wilmington Sav. Fund Socy., FSB*, 171 AD3d 626 [1st Dept 2019]). In that case, holders of 10 percent of a syndicated term loan sought to challenge certain actions undertaken by the borrower with the support of the majority holders, including actions that purportedly violated a "sacred rights" provision—similar to one in this case—requiring unanimous consent for transactions involving "all or substantially all" of the collateral. The Court held that the plaintiff's claims *other than sacred rights claim* were barred by the agreement's no-action clause, distinguishing *Cypress* with respect to such claims on the ground that the Delaware case "merely held that a no-action clause does not bar a claim by a minority lender to enforce its consent rights" (*id*. at 16). As to plaintiff's "sacred rights" claim, the Court

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 24 of 51

24 of 51

noted, "it is undisputed that the plaintiffs in this action do not lack standing to sue for the alleged violation of their consent rights" (*id*. at 17). On appeal, the First Department affirmed, holding that "[t]he motion court correctly found that the no-action clause … barred all but the [sacred rights] breach of contract claims, which allege that all or substantially all of the … collateral was transferred without unanimous approval; claims alleging the transfer of substantially all of the collateral without unanimous approval are a specifically delineated exception to the no-action clause (171 AD3d at 626 [citations omitted]).

Another judge of this Court has relied upon *Eaton Vance* in permitting "sacred rights" claims to proceed notwithstanding a broad no-action provision (*see Antara Capital Master Fund LP v Bombardier Inc.*, 78 Misc 3d 1212(A), 2023 WL 2566166 at *1, *12 [Sup Ct, NY County 2023] [Borrok, J.] [citing *Eaton Vance* in support of "the time honored exception to requiring compliance with the 'no action' clause set forth in the Indenture to establish standing in connection with a transfer of substantially all of the assets without approval" and holding that under *Eaton Vance*, the no-action clause applies "to all of the causes of action other than the claims sounding in breach of the Indenture requiring the Plaintiffs' waiver of (consent to) such breach and that compliance with the 'no action' clause is otherwise excused only where demand futility can be properly alleged"]), as has a federal bankruptcy court applying New York law (*In re TPC Group Inc.*, 22-10493 (CTG), 2022 WL 2498751, at *9 [Bankr D Del July 6, 2022] ["The obvious purpose of this provision is to ensure that these rights of individual holders cannot be taken away by an amendment to the indenture, regardless of how large or small those individual holders' share of the total outstanding indebtedness may be. Such a provision would be rendered meaningless, however, if any action to enforce the right were subject to the provisions of the no-action clause, which (under § 6.06) would require 25 percent of the holders

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 25 of 51

25 of 51

to demand that the trustee initiate such a lawsuit and even then could be defeated if the holders of a majority so instructed the trustee. This is what *Eaton Vance* presumably means when it states that the no-action clause should not be construed to apply to an effort by a minority holder to enforce its consent rights"] [applying New York law]).

Although it is unclear whether *Eaton Vance* mandates that result (the issue of applying the no-action clause to sacred rights claims appears not to have been contested in that case, and thus certain language in the opinions arguably is dicta), the Court finds the reasoning of the foregoing decisions to be persuasive. By contrast, Legacy Lions Gate's reliance upon *Chatham Capital Holdings, Inc. v Conru* (92 F4th 107 [2d Cir 2024]) for a contrary position is misplaced. That case did not involve claims to enforce a noteholder's individual consent right and did not address *Eaton Vance*. For the foregoing reasons, the Court finds that the no-action clause is inapplicable to Plaintiffs' claims to the extent they are based on individual consent "sacred rights" under Section 9.2 of the Indenture.[4]

However, under *Eaton Vance*, contractual claims that allege breaches outside of the sacred rights provisions are barred by the no-action clause. Accordingly, Thebes' breach of contract claim against Legacy Lions Gate (Count II) is dismissed on that ground (*Eaton Vance*, 171 AD3d at 626 ["[t]he motion court correctly found that the no-action clause . . . barred all but the [sacred rights] breach of contract claims"]). Thebes' conclusory reference to "futility" as a

---

[4] This Court's decision in *TriMark* (72 Misc 3d 1218(A)), on which Plaintiffs rely in the alternative, is distinguishable. In that case, an *amendment* to the no-action provision was "an integral part of [the alleged] breach of contract" and was "purpose-built" to immunize the purportedly breaching conduct from challenge. Unlike in that case, here the no-action provision was not amended in connection with the challenged transaction.

654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT    page 26 of 51
CORPORATION, ET AL
Motion No.  010 011 012 013

26 of 51

ground for avoiding the no-action provision as to ordinary breach of contract claims against Legacy Lions Gate (NYSCEF 199 at 17) is unavailing.

The same reasoning would not, however, apply to Thebes' claims against the Trustee. As stated in *Quadrant*, a no-action clause "cannot serve as an outright prohibition on a suit" because "[t]here are claims which, by law, cannot be prohibited by a no-action clause, most notably claims against the trustee" (23 NY3d at 566–67, citing *Cruden v Bank of New York*, 957 F2d 961, 968 [2d Cir 1992] [noting that a no-action clause will not bar securityholder suit against Trustee because "it would be absurd to require the debenture holders to ask the Trustee to sue itself"]).

## II. Legacy Lions Gate's Motion to Dismiss CPPIB's and Thebes' Complaints (Mot. Seq. 013)

### A. *Declaratory Judgment – Sacred Rights*

Turning to the merits, Plaintiffs allege that Legacy Lions Gate breached several "sacred rights" provisions contained in Section 9.02(e) of the Indenture and seek a declaration that the amendments are null and void. Specifically, both CPPIB and Thebes allege that Legacy Lions Gate breached Sections 9.02(e)(4), (6), and (8). Thebes additionally alleges that Legacy Lions Gate breached Section 9.02(e)(3).

As this Court noted in *TriMark*: "'In a case such as this one, in which Defendants rely principally on the text of the parties' contract, dismissal is warranted only when the agreement "unambiguously contradicts the allegations supporting a [plaintiff's] cause of action.' An agreement is unambiguous if 'the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference in opinion.' Where the parties have set down their

**654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

page 27 of 51

27 of 51

agreement in a clear, complete document, their writing should be enforced as to its unambiguous terms. An agreement does not become ambiguous 'simply because the parties to the litigation argue different interpretations.' 'To be found ambiguous, a contract must be susceptible of more than one commercially reasonable interpretation. The existence of ambiguity must be determined by examining the entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed, with the wording considered in the light of the obligation as a whole and the intention of the parties as manifested thereby.' Whether an agreement is ambiguous is 'a question of law for the court' to decide" (*TriMark,* 72 Misc 3d 1218(A) at *9 [citations omitted]). "Dismissal of a claim predicated on an alleged breach is therefore inappropriate if a court determines that the contract is ambiguous and cannot be construed as a matter of law" (*STG*, 88 Misc 3d 1203(A)*12).

Taking Plaintiffs' factual allegations as true, and giving them the benefit of all reasonable inferences, Plaintiffs have stated a viable claim that the Separation Transaction (and in particular the Supplemental Indenture) required their consent and that of "each affected Holder" under Section 9.02(e)(8) (Notes Guarantee). The alleged breach of that "sacred right" is the core of the Plaintiffs' claims, which are premised on the involuntary and selective "gutting" of the financial support underlying the Notes. Plaintiffs have not, however, stated viable claims with respect to purported breaches of Sections 9.02(e)(3), (4), and (6), which focus on ancillary aspects of the purported "scheme" but are not predicated on Indenture amendments triggering enhanced consent rights under Section 9.2(e).

i. _Notes Guarantee (Section 9.02[e][8])_

Section 9.02(e)(8) of the Indenture provides that without the consent of each affected Holder, an amendment, supplement or waiver of the Indenture may not "modify the form of the

**654398/2024 CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL** page 28 of 51
**Motion No. 010 011 012 013**

28 of 51

Notes Guarantee in any manner adverse to the Holders or release the Guarantors constituting all or substantially all of the value of the Notes Guarantees of all Guarantors as a whole" without the "consent of each affected Holder." (Indenture § 9.02[e][8]).  Plaintiffs have adequately alleged that Legacy Lions Gate breached both prongs of Section 9.02(e)(8).

### a)   *"Amendment, supplement or waiver"*

As an initial matter, Legacy Lion's Gate contention that it could have accomplished the Separation Transaction under the Indenture without reliance on any subsequent "amendment, supplement or waiver" of the Indenture (the trigger of "sacred" consent rights under Section 9.02) is unavailing on this motion to dismiss.  While Legacy Lions Gate may ultimately be able to sustain that position, at this stage it bears the burden of establishing that Plaintiffs' claims are conclusively rebutted by the unambiguous terms of the agreement.  Here, Plaintiffs correctly point out that in its own Trustee notices Legacy Lions Gate expressly invoked Section 10.06(a)(6)—added by the Supplemental Indenture, and thus plainly an "amendment"—as one of the grounds on which the Studio Business Guarantors were "automatically and unconditionally" released.[5]  Moreover, Plaintiffs also rely upon amendments to certain defined terms that impact the substance of Indenture provisions that were not otherwise amended, including Section 2(a)(xii) of the Supplemental Indenture which purportedly gave Legacy Lions Gate a new and

---

[5] While Legacy Lions Gate argues that original Indenture Sections 10.06(a)(1), (a)(2), and (a)(5) sufficed to permit the Separation Transaction without regard to the Supplemental Indenture, Plaintiffs have adequately disputed that position for purposes of the present motion.  At a minimum, there is a legitimately contestable issue concerning Legacy Lions Gate's reliance on the various sections of 10.06(a), as amended, to release the Notes Guarantees that cannot be resolved definitively on a motion to dismiss.

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT**          page 29 of 51
**CORPORATION, ET AL**
**Motion No.  010 011 012 013**

29 of 51

broader right to "at any time and from time to time to designate any Subsidiary to be an Unrestricted Subsidiary" that is, in turn, subject to removal as a Guarantor.

Whether and to what extent Legacy Lions Gate in fact relied (or had to rely) on these and other amended Indenture provisions and definitions raises questions that cannot be resolved on the present motion to dismiss (*see TriMark*, 72 Misc 3d 1218(A) at *12 [amended definition of Intercreditor Agreements "effectively modifie[d]" provision referenced in sacred rights provision]; *STG*, 88 Misc 3d 1203(A)*13–14 [rejecting argument that "amendments to the sacred rights provisions occur only if a change is directly made to the sacred rights provisions within Section 10.1(a), and not where textual changes are made to provisions other than Section 10.1(a) that '*impact* the protections in Section 10.1(a)'"]).[6] In sum, these "actual, textual amendment[s]" of substantive Indenture provisions and definitions distinguish this case from the purely transactional conduct that was found by the First Department not to trigger sacred rights provisions in *Mitel* (233 AD3d at 615).

### b) *"Form of the Notes Guarantee"*

Turning to the text of Section 9.02(e)(8), the undefined term "form of the Notes Guarantee" reasonably can be read—as Plaintiffs contend—to encompass the basic structure and

---

[6] CPPIB also references the Supplemental Indenture's addition of a new subsection (c) to the definition of Unrestricted Subsidiary: "Solely for purposes of clause (a) hereof, from and after May 8, 2024, any reference to a section or defined term of the Indenture contained in clause (a) hereof shall be construed as a reference to such section or defined term as if such section (including any defined terms used within such section) or defined term had not been amended or modified by the Supplemental Indenture." CPPIB surmises that this curious language was added "[s]o that [Legacy Lion's Gate] could argue, as it does here, that it has used the 'original' Indenture provisions to designate Unrestricted Subsidiaries and effectuate releases and did not need to rely on Section 10.06(a)(6), the 'newly-added provision,' to release guarantees" (NYSCEF 198 at 14).

**654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

page 30 of 51

30 of 51

scope of Article 10 ("GUARANTEES") of the Indenture.  Under that reading, and taking Plaintiffs' factual allegations as true, the revisions contained in the Supplemental Indenture that directly and indirectly modify Article 10 can be found to trigger the consent requirement of Section 9.02(e)(8).  As described above, these include Indenture revisions and amendments that permitted Legacy Lions Gate to fundamentally and structurally change the credit support underlying the Notes by removing the company's core Studio business (its longstanding financial anchor of the company and the Notes) entirely from the equation.

Legacy Lions Gate posits a narrower reading of "form of the Notes Guarantee" as limited solely to the text of Section 10.01 of the Indenture, which is entitled "Notes Guarantee."  To support that reading, it observes that Section 10.03(b) states that "[e]ach Guarantor hereby agrees that its Notes Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Notes Guarantee on the Notes."  It also observes that "*within* section 10.01, the Indenture refers to '*this* Notes Guarantee," whereas in other provisions of the Indenture, the phrase "the Notes Guarantee" or "its Notes Guarantee" is used.   Proceeding from that premise, it argues that, because the text of Section 10.01 was not changed, by definition there has been no modification to the "form of the Notes Guarantee."  It further argues that the "form" of the Notes Guarantees means only "[t]he outer shape, structure, or configuration" of the Notes Guarantees, and not "its substance or matter" (NYSCEF 184 at 20 [citing Black's Law Dictionary]).

Even assuming for present purposes that Legacy Lions Gate has proffered a plausible reading of the contractual language, it is not a conclusive one.  First, if the parties had intended Section 9.02(e)(8) to apply *solely* to modifications of Section 10.01, they could have easily drafted Section 9.02(e)(8) accordingly, as they did in Section 9.02(e)(3) (referencing Section

3.07) and as the parties did in *Mitel* (*see* 233 AD3d at 615 ["the subject transaction did not 'amend the provisions' of §7.02 within the meaning of [the sacred rights provision]"), but they did not do so. Second, Section 10.01 itself is expressly "[s]ubject to" *all* of Article 10 and specifically provides among other things that "[t]his Note Guarantee shall not be discharged except … pursuant to Section 10.06," which as discussed above was amended in the Supplemental Indenture (with specific reference to the Separation Transaction) as were other portions of Article 10 through changes to defined terms. And finally, while Legacy Lions Gate is correct that in some legal settings the "form" of a thing may be distinguishable from its "substance" (as in, exalting "form over substance"[7]), that does not mean that form and substance are *always* distinct or in conflict. Nor does it suffice to conclusively define "form of the Notes Guarantee" as being divorced from the process and grounds upon which Guarantors (or even whole businesses) may be jettisoned thus—at least arguably—changing the "shape" or "structure" of the Notes Guarantee itself.[8]

---

[7] *See e.g., Neponsit Prop. Owners' Ass'n v Emigrant Indus. Sav. Bank*, 278 NY 248, 258 (1938) ("unless we exalt technical form over substance, the distinction between covenants which run with land and covenants which are personal, must depend upon the effect of the covenant on the legal rights which otherwise would flow from ownership of land and which are connected with the land. The problem then is: Does the covenant in purpose and effect substantially alter these rights?").

[8] "Form" is also commonly used in contractual settings to designate specific agreed-upon language to govern subsequent events, often as an attachment to the agreement itself. Indeed, the parties used such an approach to "form" in Section 4.15(a)(1) of the Indenture. That section required new Guarantors to "execute and deliver a supplemental indenture to this Indenture, **the form of which is attached hereto as Exhibit C**, pursuant to which such Restricted Subsidiary will agree to be a Guarantor under the Indenture…." (Indenture § 4.15[a][1] [emphasis added]). That form, in turn, specified that "[t]he Guaranteeing Subsidiary hereby agrees to be a Guarantor under the Indenture and to be bound by the terms of the Indenture applicable to Guarantors, including, but not limited to, Article 10 thereof." (*id.,* Exhibit C at E-1). Notably, this "form" did not limit its scope to Section 10.01 but instead extended to all of Article 10.

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT
CORPORATION, ET AL
Motion No. 010 011 012 013

page 32 of 51

32 of 51

[* 32]

In sum, Legacy Lions Gate's focus on Section 10.01 of the Indenture as wholly defining the "form of the Notes Guarantee" is unpersuasive, at least at the motion to dismiss stage when any potential ambiguities are resolved against dismissal (*Mayville Eng'g Co., Inc. v Peloton Interactive, Inc.*, 226 AD3d 482, 483 [1st Dept 2024] [dismissal inappropriate when plaintiff "offered a facially reasonable reading of the relevant contract provisions"]; *Schulte Roth & Zabel LLP v Metro. 919 3rd Ave. LLC*, 202 AD3d 641, 641 [1st Dept 2022]).

### c) *"All or substantially all of the value of the Notes Guarantees"*

Separately, Plaintiffs also adequately allege that the Supplemental Indenture effected the release of "Guarantors constituting all or substantially all of the value of the Notes Guarantees of all Guarantors as a whole," thus satisfying the alternative prong of Section 9.02(e)(8). In seeking dismissal, Legacy Lions Gate makes credible arguments that Plaintiffs' reliance on the number of released Studio guarantors as compared with the number of remaining Starz guarantors (230 vs. 13), or their relative market capitalization ($1.1938 billion vs. $219 million), is insufficient by itself to establish that they constituted "all or substantially all" of the value of the Notes Guarantees.

However, on a motion to dismiss, the Court is required to accept as true Plaintiffs' factual allegation that, upon consummation of the Separation Transaction, the release of the 230 Guarantors affiliated with the Studios Business constituted substantially all of the value of the Notes Guarantees (*Cointech, Inc. v Masaryk Towers Corp.*, 7 AD3d 376, 379 [1st Dept 2004] ["disputed issue of fact [] cannot be the basis for dismissal pursuant to CPLR 3211"]). Legacy Lions Gate may dispute the relative value of the Studio and Starz guarantor entities on a full record at summary judgment or trial (*see HFTP Investments, L.L.C. v Grupo TMM, S.A.*, 2004 WL 5641710 [Sup Ct, NY County 2004] ["[A] determination as to whether there has been a sale

**654398/2024 CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No. 010 011 012 013**

page 33 of 51

33 of 51

of 'all or substantially all' of an entity's assets requires an inquiry into both the quantitative and qualitative aspects of the sale in question"], *affd*, 18 AD3d 369 [1st Dept 2005]).  While "all or substantially all" is a demanding standard, Plaintiffs have pled enough to avoid dismissal.

In sum, Plaintiffs have stated a facially viable claim for breach of Section 9.02(e)(8) of the Indenture.

### ii.    *Preferential Redemption or Repurchase (Section 9.02[e][4])*

Plaintiffs have not, however, stated a viable claim for breach of Section 9.02(e)(4).  That section provides that without the consent of each affected Holder, an amendment, supplement or waiver of the Indenture may not: "reduce the premium payable upon the redemption or repurchase of any Note or change the time at which any Note may be redeemed or repurchased as described under Section 3.07 whether through an amendment or waiver of provisions in the covenants, definitions or otherwise." (Indenture § 9.02[e][4]).  Plaintiffs claim that the exchange offer through which Participating Noteholders were able to swap their Notes for newly issued notes with improved terms—as compensation for consenting to the Separation Transaction— effectively constituted a redemption or repurchase under Section 3.07.

There are, however, critical flaws in Plaintiffs' claim.  First, as in *Mitel* which involved a similar "uptiering" of notes to certain holders, the Supplemental Indenture made no change to the applicable Indenture provision cited in the sacred right paragraph, here Section 3.07 (*Mitel*, 233 AD3d at 115 ["the subject transaction did not 'amend the provisions of' section 7.02"]).  Instead, the Supplemental Indenture simply stated that "[f]or the avoidance of doubt, the Supplemental Indenture Transactions are not being effected pursuant to this Article 3 and this Article 3 does not and will not apply to the Supplemental Indenture Transactions" (Supplemental Indenture § 2[c]).  While perhaps intended as superficial protection against the argument being made here,

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT
CORPORATION, ET AL
Motion No.  010 011 012 013

page 34 of 51

that provision does not actually amend or modify or waive any terms contained in Article 3, including Section 3.07. If the referenced transaction *was* in fact subject to Article 3 by its terms, a self-serving statement to the contrary in the Supplemental Indenture would not stand in the way of that conclusion. Accordingly, because there is no allegation of an amendment or change to Section 3.07, under the reasoning of *Mitel* the sacred right contained in Section 9.02(e)(4) is not implicated.

In any event, the Supplement Indenture language on which Plaintiffs rely was accurate because the transaction at issue *was* an exchange offer. Section 9.02 (a) of the Indenture expressly states that consents "obtained in connection with a purchase of, or tender offer or exchange offer for, Notes" are valid. There is thus a clear distinction made in Article 9 and elsewhere in the Indenture between exchange offers (which are negotiated with Holders and can be approved by their consent) and redemptions (which are triggered at the option *of the issuer*). As Legacy Lions Gate points out, "[t]hat language would be meaningless if the only way for [Legacy Lions Gate] to reacquire the Notes is through an optional redemption in which all holders are *required* to participate" (NYSCEF 184 at 17 [emphasis in original]; *cf. Mitel*, 233 AD3d at 616 [agreement specifically authorized the borrower to "purchase by way of assignment … at any time," and "[t]here is no indication in the agreements that a refinancing or exchange cannot include a purchase"]).

In sum, Plaintiffs have not stated a viable claim for breach of Section 9.02(e)(4) of the Indenture.

    *iii.*     <u>Right to Institute Suit on or After Due Date (Section 9.02[e][6])</u>

Plaintiffs also have not stated a viable claim for breach of Section 9.02(e)(6). That section provides that without the consent of each affected Holder, an amendment, supplement or

**654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

page 35 of 51

35 of 51

waiver under Section 9.02 may not "amend the right of any Holder to institute suit for the enforcement of any payment of principal, premium, if any, or interest on or with respect to such Holder's Notes on or after the respective due dates expressed in this Indenture or such Notes." (Indenture § 9.02[e][6]). This provision echoes the terms of Indenture Section 6.07: "Notwithstanding any other provision of this Indenture, the contractual right of any Holder to bring suit for the enforcement of any payment of principal, premium, if any, and interest (including Additional Amounts) on its Note, on or after the respective due dates expressed in this Indenture or such Note shall not be amended without the consent of such Holder" (Indenture § 6.07).

Although it is undisputed that there has been no amendment, supplement, or waiver of Section 6.07, Plaintiffs nevertheless contend that this provision has been *effectively* amended by the deletion of certain Events of Default in the Supplemental Indenture. Again, *Mitel* provides an apt rejoinder: "Had the parties wanted an effective or functional amendment to be covered [by a sacred rights provision], they could have used language to that effect, as they did elsewhere. Instead, they used terms suggesting an actual, textual amendment. Contrary to plaintiffs' claim, the amended agreements did not amend [the applicable defined term]" (233 AD3d at 615 [citation omitted]).

### iv. *Reduction of Principal (Section 9.02[e][3])*

Finally, Thebes has not stated a viable claim for breach of Section 9.02(e)(3). That section provides that without the consent of each affected Holder, an amendment, supplement or waiver under Section 9.02 may not "reduce the principal of or extend the Stated Maturity of any Note." (Indenture § 9.02[e][3]). This is a variant of Plaintiffs' argument under Section 9.02(e)(3) that similarly seeks to shoehorn the Participating Noteholders' acceptance of an exchange offer

**654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No. 010 011 012 013**

page 36 of 51

36 of 51

(*i.e.*, to accept new notes on favorable terms in exchange for its old notes) into one of the enumerated sacred rights. This argument fails for similar reasons under the binding authority of *Mitel*.

As *Mitel* directs, the consent requirement of Section 9.02(e)(3) is triggered only by an "actual, textual amendment" that reduced the principal or extended the maturity of "any Note." Even accepting Thebes' argument that unlike the plaintiff in *Mitel* it can base its claims on changes to the Participating Noteholders' Notes (rather than Thebes' own Notes),[9] its argument fails because here the changes to those Notes were not triggered by any amendment to the Indenture requiring Thebes' consent. Instead, the changes to the Participating Noteholders' Notes were entirely made via the Exchange Agreement, and the original Notes were then delivered to the Trustee for cancellation under Section 2.11 of the Indenture. From a "sacred rights" perspective, then, the transaction is indistinguishable from the one involved in *Mitel*.

Accordingly, Thebes has not stated a viable claim for breach of Section 9.02(e)(3) of the Indenture.

### B. Breach of the Implied Covenant

Legacy Lions Gate's motion to dismiss Plaintiffs' implied covenant claims is granted. "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance" (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 153 [2002]

---

[9] The agreement in *Mitel* "only require[d] the consent of 'each Lender directly adversely affected' by a change in loan terms," and the court noted that in that case "the effect [of changes in other holders' loan terms] on plaintiffs' loans was indirect" (233 AD3d at 615). By contrast, in the present case Section 9.02(e) requires, when applicable, the "consent of each affected Holder." The Court agrees with Thebes that the broader language in the Legacy Lions Gate Indenture could, if otherwise applicable, require the consent of an "indirectly" adversely affected Holder.

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT                    page 37 of 51
CORPORATION, ET AL
Motion No.  010 011 012 013

37 of 51

[citations omitted]). "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" (*id.* [citations omitted]). However, [t]he duty of good faith and fair dealing does not imply obligations inconsistent with contractual provisions or that were not bargained for. Nor can it impose obligations beyond the express terms of the parties' agreement. Stated differently, an implied covenant claim may not be used as a substitute for a nonviable claim of breach of contract" (*TriMark*, 72 Misc 3d 1218(A) [cleaned up]).

Here, the Indenture contains specific, detailed "sacred rights" provisions that list Plaintiffs' consent rights, and the Court has determined that Plaintiffs have sufficiently stated a breach of one of those carefully delineated rights but not others. If Legacy Lions Gate was within their contractual rights to amend the Indenture without Plaintiffs' consent, "that is the end of the story … [because] the implied covenant cannot be used to impose obligations or restrictions going beyond what is set forth in the contract" (*id.*; *see also Mitel*, 233 AD3d at 616–17 [dismissing implied covenant claim where "[t]he agreements, which were negotiated by sophisticated parties, contain specific, detailed provisions regarding when plaintiffs are entitled to pro rata treatment and when they are not…. Had the parties wanted to prohibit amendments such as those at issue here, they could have done so, but they did not"]).

Moreover, where, as here, "a cause of action for breach of the implied covenant of good faith and fair dealing is based on the same operative facts and seeks the same damages as a cause of action for breach of contract, the good faith claim is duplicative and should be dismissed" (*AEA Middle Mkt. Debt Funding LLC v Marblegate Asset Mgt., LLC*, 214 AD3d 111, 132–33 [1st Dept 2023]).

### III. The Trustee's Motion to Dismiss Thebes' Claims (Mot. Seq. 012)

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT          page 38 of 51
CORPORATION, ET AL
Motion No.  010 011 012 013

38 of 51

## A. Breach of Contract

The motion by Deutsche Bank as Trustee to dismiss Thebes' second cause of action for breach of contract is granted.  Under the terms of the Indenture and New York law, unless a contractually defined Event of Default ("EOD") has occurred and is ongoing, the contractual duties of an indenture trustee, such as the Trustee, are limited to performing administrative and ministerial duties expressly set forth in the Indenture.  Specifically, Section 7.01(b) of the Indenture states that, before an EOD, (1) "the Trustee need perform only those duties that are specifically set forth in this Indenture and no others," and (2) "no implied covenants or obligations shall be read into this Indenture against the Trustee." (Indenture § 7.01[b]; *see IKB Intl., S.A. v Wells Fargo Bank, N.A.*, 40 NY3d 277, 285 [2023] [noting that "[a] trustee is required to do only what the governing agreements prescribe" and that "[b]efore an EOD has occurred . . . Trustees' 'rights and duties [are] defined ... exclusively by the terms of the agreement'"] [citations omitted]).

Accordingly, Thebes' claim against the Trustee is premised on there being an EOD.  In that regard, Section 7.01 provides that "[i]f an Event of Default *of which the Trustee has notice* has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs" (Indenture § 7.01 [emphasis added]).  Notably, under Section 7.05, the Trustee "shall not be deemed to have notice of any Default or Event of Default … unless *written notice* of any event which is in fact such a Default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee, and such notice references the existence of a Default, the Notes, and this Indenture." (Indenture §7.05 [emphasis added]).

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 39 of 51

39 of 51

Here, Thebes does not allege that the Trustee received written notice of an EOD at or before the time it alleges the Trustee's conduct breached the Indenture. Nor does Thebes address the Trustee's argument regarding the lack of notice. This failing is fatal to Thebes' claim against the Trustee because the notice provision is a condition precedent to triggering the Trustee's obligations under Section 7.01.

Accordingly, even assuming Thebes sufficiently alleged an event of default,[10] Thebes' breach of contract claim against the Trustee must be dismissed for the failure to allege the contractually required notice (*see W. and S. Life Ins. Co. v U.S. Bank N.A.*, 209 AD3d 6, 17 [1st Dept 2022] [holding that the "Supreme Court correctly determined that plaintiffs' post-EOD claims. . . should be dismissed for failure to allege that defendant had written notice of the EOD."]; *Phoenix Light SF Ltd. v Bank of New York Mellon*, 2017 WL 3973951, at *18 [SDNY Sept. 7, 2017] [granting summary judgment to trustee where "there is no evidence that [trustee] received written notice or had actual knowledge of any Event of Default relative to these four Trusts"]).

### B. Breach of the Implied Covenant

The Trustee's motion to dismiss Thebes' breach of the implied covenant claim is also granted. The claim is duplicative of Thebes' breach of contract claim (*TriMark*, 72 Misc 3d 1218(A) ["[A] claim for breach of the implied covenant will be dismissed if it "relies on the same facts that form the basis for the breach of contract claim and seek[s] the exact same damages"], citing *320 W. 115 Realty LLC v All Bldg. Constr. Corp.*, 194 AD3d 511, 512 [1st

---

[10] The Trustee argues that an EOD could only have happened a year later in May 2025 when the transaction was actually completed.

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT**     **page 40 of 51**
**CORPORATION, ET AL**
**Motion No.  010 011 012 013**

40 of 51

[* 40]

Dept 2021]). Moreover, Thebes cannot plead around its failure to follow the notice requirement by asserting an implied covenant claim, which is effectively a breach of contract claim (albeit via an implied term). It is well-settled that "an implied covenant claim 'may not be used as a substitute for a nonviable claim of breach of contract'" (*TriMark*, 72 Misc 3d 1218(A) *13).

### IV. Participating Noteholders' Motion to Dismiss Thebes' Complaint (Mot. Seq. 011)

The Participating Noteholders' motion to dismiss Thebes' Third Amended Complaint as alleged against them for breach of contract and breach of the implied covenant is granted, without prejudice to seeking leave to replead to assert non-contractual claims.

The contract-based claims against the Participating Noteholders fail because they are not parties to the Indenture and have no contractual obligations under that agreement. The Indenture is a contract among Lions Gate Holdings, the Guarantors, and the Trustee, and imposes contractual obligations on each of those parties. The Participating Noteholders, in contrast, were intended *beneficiaries* of the Indenture (Indenture at 1 [preamble] ["[T]he Issuer and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the Notes."]). This arrangement is typical of indenture agreements (*see e.g.*, *In re Wesco Aircraft Holdings, Inc.,* 2024 WL 156211, at *5 [Bankr SD Tex Jan. 14, 2024], supplemented, 2024 WL 255855 [Bankr SD Tex Jan. 23, 2024]; *iHeart Communications, Inc. v Benefit St. Partners LLC*, 2017 WL 1032510, at *2 [WD Tex Mar. 16, 2017] ["Noteholders are not parties or signatories to the indentures"]).

Like all non-parties, third-party beneficiaries are not bound by obligations in a contract unless they have manifested an intent to be bound by such obligations (*Dynamic Worldwide Logistics, Inc. v Exclusive Expressions, LLC*, 77 F Supp 3d 364, 374 [SDNY 2015] ["Contractual

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT**          page 41 of 51
**CORPORATION, ET AL**
**Motion No.  010 011 012 013**

41 of 51

obligations cannot be imposed on an intended beneficiary absent a showing that the third party manifested acceptance to be bound"]; *see also Horsehead Indus., Inc. v Metallgesellschaft AG*, 239 AD2d 171, 172 [1st Dept 1997] ["a parent company can be held liable as a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract"]). However, Thebes fails to allege facts indicating that the Participating Noteholders manifested an intention to be bound.

Thebes' reliance on the Exchange Agreement (to which Thebes was not a party) to suggest that Participating Noteholders manifested an intent to be bound *to the Indenture* is unavailing. Although the Exchange Agreement references amendments "in accordance with the terms of the [] Indenture," that language does not express an intent by the Participating Noteholders to assume any obligations to Thebes under the Indenture. Indeed, the Exchange Agreement contains a provision explicitly disclaiming any obligations to nonparties (Exchange Agreement at § 7.12 ["This Agreement is solely for the benefit of the Parties and no other person shall be a third-party beneficiary of this Agreement."]).[11]

In sum, because there is no contract between Thebes and the Participating Noteholders, and no manifestation of an intent to be bound, the Participating Noteholders cannot be liable for breach of contract or for breach of the implied covenant. Likewise, Thebes' remaining claim for declaratory judgment, which seeks declaratory relief that "Thebes . . . and the [Participating]

---

[11] In any event, even if Participating Noteholders had manifested an intent to be bound by the Indenture, the logical conclusion of that is that the *other parties to the Indenture* could sue the Participating Noteholders – not other non-parties such as Thebes (*see In re Wesco Aircraft Holdings, Inc.,* 23-3091, 2025 WL 354858, at *26 [Bankr SD Tex Jan. 15, 2025] ["Because the participating unsecured noteholders are not parties to the 2027 Indenture, they cannot be obligated or held liable for breaches under the Indenture"] [applying New York law]).

**654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT**     page 42 of 51
**CORPORATION, ET AL**
**Motion No.  010 011 012 013**

42 of 51

Noteholders are parties to, or assignees and successors in interest to, the [] Indenture," and have breached the Indenture (Thebes Compl. ¶¶ 179–196), fails for the same reasons. As noted, the Indenture is a contract among the Issuer, the Guarantors, and the Trustee, which imposes various contractual obligations on those contractual parties. The assertion that holders such as the Participating Noteholders have any contractual obligations as against other holders (such as Thebes), is unfounded.[12]

At oral argument, Thebes requested that if the Court were to find that the Participating Noteholders did not assume obligations under the Indenture, they be granted leave to amend their complaint to add a claim for tortious interference against the Participating Noteholders (NYSCEF 229 ["Tr."] 121:15–20). Given the Court's findings here, Thebes may seek leave to amend their complaint to add non-contractual claims against the Participating Noteholders, excluding the Personal Jurisdiction Movants and State Noteholders who have been dismissed on independent grounds for the reasons described below. The Court expresses no view at this time as to whether any such proposed claim is legally viable.

The separate motion by Liberty 77 Fund International L.P., Liberty 77 Fund L.P., Commissioners of the Land Office, Contra Costa County Employees' Retirement Association, Virtus Convertible & Income Fund, Virtus Convertible & Income Fund II, and Virtus Diversified Income & Convertible Fund, and Virtus Income and Growth Fund (together, the "Personal Jurisdiction Movants") to dismiss the claims against them is granted on the independent ground that the Court lacks personal jurisdiction over those entities. Thebes relies on a New York forum selection clause in the Exchange Agreement to argue that the Personal Jurisdiction Movants have

---

[12] Given this conclusion, the Court need not address the Participating Noteholder's additional arguments.

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT          page 43 of 51
CORPORATION, ET AL
Motion No. 010 011 012 013

43 of 51

consented to personal jurisdiction in New York. Sections 7.6 and 7.7 of the Exchange Agreement provide that any suit "arising out of or relating to [the Exchange Agreement]" may be brought in courts located in New York County, and that "each of the Parties irrevocably and unconditionally submits to the personal jurisdiction" in the Courts of New York County for such suits (Exchange Agreement §§ 7.6–7.7).

"[G]enerally only parties in privity of contract may enforce terms of the contract such as a forum selection clause found within the agreement" (*Freeford Ltd. v Pendleton*, 53 AD3d 32, 38 [1st Dept 2008]).[13] *Freeford* outlined three narrow circumstances in which a non-signatory may enforce a forum selection clause: (1) where they are a third-party beneficiary of the agreement; (2) where there is a "global transaction" and the agreements are "executed at the same time, by the same parties or for the same purpose;" and (3) where the non-signatory is "closely related" to one of the signatories and is "sufficiently close so that enforcement of the clause is foreseeable by virtue of the relationship between them" (*id.* at 38–39).

Here, Thebes does not claim to be a third-party beneficiary of the Exchange Agreement or a party to a "global transaction" with the Personal Jurisdiction Movants, nor does Thebes claim to be closely related to a signatory. In *Freeford*, the court reasoned that the plaintiff was an intended beneficiary to a forum selection clause since it signed a separate contract "as an inducement" for a related contract to occur (*id.* at 41). Nothing of the sort allegedly occurred here. Rather, Thebes only argues that the Participating Noteholders had every reason to foresee

---

[13] Thebes' reliance on New York's General Obligations Law § 5-1402[1], which allows courts to exercise jurisdiction by contractual consent, is unavailing. That provision merely recognizes that parties to a contract can, in a forum selection clause, consent to jurisdiction in New York, and such provisions are enforceable "regardless of any inconvenience to the parties" (*Natl. Union Fire Ins. Co. of Pittsburgh, Pa. v Worley*, 257 AD2d 228, 230 [1st Dept 1999]). It does not expand the scope of the forum selection clause itself, which is what Thebes seeks to do here.

654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT                 page 44 of 51
CORPORATION, ET AL
Motion No.  010 011 012 013

44 of 51

that Thebes would seek to enforce the forum selection clause against them because it was foreseeable that Thebes would challenge the "scheme" in court—glossing over the requirement that the relationship between the parties "must be *sufficiently close* so that enforcement of the clause is foreseeable by *virtue of the relationship between them*" (*id.* at 39 [emphasis added]). Since Thebes has failed to sufficiently allege personal jurisdiction over these Movants, they are dismissed.

Finally, the claims asserted against the California Public Employees Retirement System ("CalPERS"), the California State Teachers' Retirement System ("CalSTERS") and the Commissioners of the Land Office ("CLO") (together, the "State Noteholders") are dismissed on the independent ground of sovereign immunity. Thebes does not deny that the State Noteholders are sovereign State-created entities that are generally immune from suit in New York courts (*Colt v New Jersey Tr. Corp.*, 43 NY3d 463, 466 [2024], *affd and remanded sub nom. Galette v New Jersey Tr. Corp.*, 607 US —, 2026 WL 598450 [2026]); *Franchise Tax Bd. of California v Hyatt*, 587 US 230 [2019]). Rather, Thebes argues that the State Noteholders waived their immunity "with respect to actions like this one that arise out of or relate to the Exchange Agreement" because the Exchange Agreement contains a forum selection clause providing for disputes to be litigated in the state of New York (NYSCEF 199 at 53–54).

To demonstrate that the State Noteholders waived sovereign immunity, Thebes must show the State Noteholders "voluntarily invoke[d] [the court's] jurisdiction, or . . .ma[de] a "clear declaration" that it intends to submit itself to [the court's] jurisdiction" (*Coll. Sav. Bank v Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 US 666, 675–76 [1999]). For the reasons discussed above, Thebes' waiver argument fails because the forum selection clause only applies to claims under the Exchange Agreement by parties to the Exchange Agreement

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 45 of 51

45 of 51

(Exchange Agreement §§ 7.6–7.7).  As noted, Thebes is not a "party" to the Exchange Agreement, and New York courts have consistently held that—like all contract provisions—contractual provisions for choice of law and venue selection may be enforced only by the parties to the contract and none of the limited exceptions apply here (*see Freeford*, 53 AD3d at 38–39). Moreover, Thebes has failed to demonstrate that the State Noteholders declared any intent to waive sovereign immunity as against non-signatories.  As noted, the Exchange Agreement expressly disclaimed third party beneficiaries (Exchange Agreement § 7.12).  Finally, Thebes incorrectly asserts that courts addressing "analogous contractual provisions" have found waivers of sovereign immunity. Thebes' cases are inapposite because they addressed claims made by parties in contractual privity or beneficiaries seeking to enforce a contractual waiver (*see Marisol A. ex rel. Forbes v Giuliani*, 157 F Supp 2d 303 [SDNY 2001]; *Watson v Texas*, 261 F3d 436 [5th Cir 2001]).  Accordingly, the claims against the State Noteholders are dismissed on the alternative ground of sovereign immunity.

### V.    Eagle Equity's Motion to Dismiss Thebes' Complaint (Mot. Seq. 010)

Finally, Eagle Equity's motion to dismiss the claims asserted against it in Thebes' Third Amended Complaint is denied.  "Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom" (*Lama Holding Co. v Smith Barney Inc.*, 88 NY2d 413, 424 [1996]).  A "tortious interference claim should be dismissed" when "[t]he relevant allegations [are] vague and conclusory," or supported by "mere speculation." (*Carlyle, LLC v Quik Park 1633 Garage LLC*, 160 AD3d 476, 477 [1st Dept 2018]).  When "[a]ccepting the facts as alleged in the complaint as true, according plaintiff the

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT
CORPORATION, ET AL
Motion No.  010 011 012 013

page 46 of 51

benefit of every possible favorable inference, and determining only whether the facts as alleged fit within any cognizable legal theory," Thebes has adequately pleaded the requisite elements of a tortious interference claim (*Wells Fargo Bank, N.A. v ADF Operating Corp.*, 50 AD3d 280 [1st Dept 2008] [finding that tortious interference claim was adequately pled] [citation omitted]).

Eagle Equity's arguments in support of its motion to dismiss these claims are unavailing:

First, Eagle Equity argues that Thebes has not sufficiently pleaded that Eagle Equity took any "specific action" to cause Legacy Lions Gate's breach of the Indenture. However, Thebes adequately alleges that Eagle Equity owned substantial equity in SEAC, which was in line to receive the valuable Studio Business assets once the SEAC Transaction closed (Thebes Compl. ¶¶ 11, 15). However, certain Participating Noteholders purportedly threatened litigation to challenge the transfer of the Studio Business assets to SEAC, putting at risk SEAC's (and therefore Eagle Equity's) opportunity to receive the benefit of those valuable assets (Thebes Compl. ¶¶ 16, 103). Thus, Thebes alleges that "Lions Gate and Eagle Equity conspired to reach a secret agreement with a subgroup of Lions Gate noteholders—the [Participating] Noteholders"—to execute the Scheme, including the non-*pro-rata* Redemption (Thebes Compl. ¶¶ 13, 103) and that "Lions Gate and Eagle Equity orchestrated the Redemption because they did not want to abide by the [] Indenture in structuring [the] asset spin-off, and chose instead to accomplish that strategic goal by taking value from the Excluded Noteholders." (Thebes Compl. ¶ 14). Thus, according to Thebes, the "agreement to amend the Indenture was procured by Eagle Equity," in order "[t]o ensure that Eagle Equity could obtain the benefit of the [SPAC merger], which would result in Eagle Equity holding stock in the [] Studio Business unencumbered by Starz and Lions Gate's existing liabilities" (Thebes Compl. ¶ 15; *see also id.* ¶¶ 32, 105). These

**654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL**
**Motion No.  010 011 012 013**

**page 47 of 51**

47 of 51

[* 47]

allegations, if proven, are sufficient to state a claim that Eagle Equity tortiously interfered with the Indenture by intentionally procuring a breach thereof

Equity Eagle's contention that there is a heightened pleading requirement for tortious interference claim, relying mainly on federal case law applying federal pleading rules (*see Trireme Energy Holdings, Inc. v Innogy Renewables US LLC*, 2021 WL 3668092, at *16 [SDNY Aug. 17, 2021]; *Masefield AG v Colonial Oil Indus.*, 2006 WL 346178, at *4 [SDNY Feb. 15, 2006]), is unpersuasive.  The First Department cases upon which Eagle Equity relies stand for the ordinary proposition that conclusory allegations are insufficient (*Dashdevs LLC v Capital Markets Placement, Inc.*, 210 AD3d 525, 526 [1st Dept 2022] ["[T]he allegations that plaintiff caused defendant's clients to terminate their relationship with defendant by 'defam[ing]' defendant and 'woo[ing]' the clients were vague, conclusory, and based on speculation"]; *Burrowes v Combs*, 25 AD3d 370, 373 [1st Dept 2006] ["[T]o avoid dismissal of a tortious interference with contract claim a plaintiff must support his claim with more than mere speculation"]).  Thebes's allegations are sufficiently detailed to provide notice of the nature of its claims and are not conclusory.

Second, Eagle Equity argues that Thebes failed to allege a "causal connection" between Eagle Equity's conduct and the breach of the Indenture. "A tortious interference with contract claim should be dismissed where the plaintiff fails to sufficiently allege that the contract 'would not have been breached 'but for' the defendant's conduct'" (*111 W. 57th Inv. LLC v 111 W57 Mezz Inv. LLC*, 220 AD3d 435, 436 [1st Dept 2023] [citation omitted]), though the defendant need not have been the sole proximate cause of the breach (*see Natl. Fin. Partners, Corp. v USA Tax and Ins. Services, Inc.*, 145 AD3d 440, 441 [1st Dept 2016] ["USA Tax's argument that it was not the sole proximate cause of D&A's damages is unavailing, as it need not be the sole

**654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013**

page 48 of 51

48 of 51

proximate cause to sustain a claim for tortious interference with contract"]).  Here, Thebes adequately alleges that the entire purpose of the "agreement to amend the Indenture … procured by Eagle Equity" was "[t]o ensure that Eagle Equity could obtain the benefit of the SEAC Transaction, which would result in Eagle Equity holding stock in the LG Studios Studio Business unencumbered by Starz and Lions Gate's existing liabilities." (Thebes Compl. ¶ 15; *see also id.* ¶¶ 32, 105).  While Thebes will ultimately be required to prove causation, for now it suffices that it has adequately alleged it to survive a motion to dismiss.

Third, Eagle Equity argues that Thebes' tortious interference claim should be dismissed on the basis of its legitimate "economic interest."  The economic interest defense is an affirmative defense (*Foster v Churchill*, 87 NY2d 744, 750 [1996]), and Eagle Equity has the burden of pleading and proving that defense—specifically, that it "acted to protect its own legal or financial stake in the breaching party's business" (*TriMark*, 72 Misc 3d 1218(A)).  Unlike in *TriMark*, however, Eagle Equity has not conclusively established an economic interest sufficient to dismiss the claims at this stage.

Under New York law, "the economic interest defense only applies if the alleged interferer acted to protect its interest in the breaching party's business*; an interferer acting to protect its own direct interests, rather than its interests in the breaching party, may not raise the economic interest defense" (*Hudson Bay Master Fund Ltd. v Patriot Natl., Inc.*, 16 CIV. 2767 (GBD), 2019 WL 1649983, at *16 [SDNY Mar 28, 2019] [applying New York law]).  Here, Thebes adequately alleges that before the "scheme" was executed in May 2024, "Eagle Equity had no economic interest in Legacy Lionsgate (*i.e.*, the debtor company that was party to and is in breach of the Indenture); rather, Eagle Equity owned a substantial amount of SEAC stock, which became LG Studios stock following the closing of the SEAC Transaction." (Thebes Compl. ¶

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 49 of 51

49 of 51

105; *see also id.* ¶ 32).  In these circumstances, Eagle Equity has not established a conclusive economic interest defense and thus the Court denies its motion to dismiss the tortious interference claim.

**CONCLUSION**

The Court has considered the Movants' remaining arguments and finds them unavailing except as otherwise stated.

Accordingly, it is

**ORDERED** that Eagle Equity's Motion to Dismiss (Mot. Seq. 010) is **DENIED**; it is further

**ORDERED** that the Participating Noteholders' Motion to Dismiss (Mot. Seq. 011) is **GRANTED**; provided that Thebes may seek leave to amend its complaint to plead viable non-contractual claims against Participating Noteholders other than the Personal Jurisdiction Movants and the State Noteholders (who were dismissed on independent grounds); it is further

**ORDERED** that Deutsche Bank's Motion to Dismiss (Mot. Seq. 012) is **GRANTED** and Thebes' Second Cause of Action for Breach of Contract and Third Cause of Action for Breach of the Implied Covenant as alleged against Deutsche Bank are dismissed; it is further

**ORDERED** that Legacy Lions Gate's Motion to Dismiss (Mot. Seq. 013) is **GRANTED IN PART** insofar as the Plaintiffs' First Cause of Action seeking Declaratory Judgment is dismissed in part as set forth in the Court's opinion; CPPIB's Second Cause of Action and Thebes' Third Cause of Action for Breach of the Implied Covenant are dismissed; and Thebes' Second Cause of Action for Breach of Contract is dismissed; it is further

**ORDERED** that Plaintiffs meet and confer on submitting a consolidated amended complaint; and it is further

654398/2024   CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT CORPORATION, ET AL
Motion No.  010 011 012 013

page 50 of 51

50 of 51

**ORDERED** that the parties appear for a preliminary conference via Microsoft Teams on

April 9, 2026, at 2:30 p.m., to discuss, among other things, a timeline for potential amendment of

pleadings as well as discovery and case management.[14]

This constitutes the Decision and Order of the Court.

20260317125953JMC0HEN726AF10AC32744F68E461C6CDB3838D1

| 3/17/2026 | JOEL M. COHEN, J.S.C. |
|---|---|
| **DATE** | |

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|
| | ☐ GRANTED | ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

---

[14] The parties are directed to meet and confer regarding a proposed preliminary conference order in advance of the conference date, taking into account the guidelines in the Part 3 model preliminary conference order, available online at https://www.nycourts.gov/LegacyPDFS/courts/comdiv/NY/PDFs/Part3-Preliminary-Conference-Order.pdf). They may file the proposed order and email a courtesy copy to chambers in advance of the conference.

**654398/2024  CPPIB CREDIT INVESTMENTS II INC., ET AL vs. LIONS GATE ENTERTAINMENT**     page 51 of 51
**CORPORATION, ET AL**
**Motion No.  010 011 012 013**

51 of 51